Good morning all. Our first case for argument this morning is Fidlar Technologies v. LPS Real Estate. Mr. Williams. Good morning, Your Honor. May it please the Court. Fidlar Technologies is here seeking a reversal of the grant of summary judgment by the Central District because Fidlar Technologies presented sufficient evidence from which a reasonable jury could conclude that LPS violated subsections A-4 and A-5 of the Computer Fraud and Abuse Act, 18 U.S.C. 1030, and subsection A-4c of the Illinois Computer Crime Prevention Law. The facts of this case are fairly straightforward, Your Honor. LPS began using Fidlar's Laredo system in approximately 2010. At that point, they determined, first, that they knew that they had to take copies of documents, they knew that downloading was not available, and that the per-page fees charged by many counties were, in fact, cost prohibitive to LPS's business model. So LPS, in approximately late 2010, devised a computer program that they called a web harvester that essentially removed the restrictions that Laredo placed upon documents in order to be able to download them without detection and without charging a fee. PACER, just for the Court's own edification, PACER is a similar system to Laredo. Laredo is simply for land records held by county recorders nationwide, and Fidlar is a technology company that sells software to make documents, land records, available online. LPS uses these documents... Mr. Williams? Yes, Your Honor. Good morning. Good morning, Your Honor. Here's what I've been wondering. In what sense was this access unauthorized? Because I would think when you are paying a monthly fee for unlimited access, you are authorized to see everything and copy everything by any means available. By hand, for example, or even by taking a photograph of what is on a screen. So I'm trying... this is the first thing that I'm trying to figure out here. In terms of authorization under access for the CFAA, Your Honor, the main issue there is that, first off, LPS contracted with counties to use the Laredo system, and there were restrictions that were placed on it, both by technology, in terms of what the district court referred to as hobbles, what LPS refers to as limited functionality. There are, in fact, security features that prevent this type of conduct. Secondly, the unlimited access is limited to the functionality of the system. It is not carte blanche to go in and take everything, especially when LPS knew that when it contracted with the counties, that it had to pay extra to take a copy. And so what LPS, in fact, contracted for was unlimited minutes to search. You know, you just said something, and it brings to my mind another question that I have, which is this. It just seemed to me that the statues seemed a poor fit for the complaint. How is Fidler hurt by any of this? I understand that the counties owned a lot of the computer servers that were accessed, and it is the counties that lost fees. And it sounds as if, from the briefing, as that in many cases the counties did not charge fees for copies, and so no one seems to have lost anything. So where is the harm to Fidler? The harm to Fidler is in its business and business reputation. Fidler's software is supposed to generate revenue for the counties. LPS knew this through the testimony of their witness, Linda Taylor, who said we knew we had to pay to take a copy. Fidler, in fact, suffered damages because one county fired them, and many counties shut off LPS as a user, and therefore Fidler shared in those fees, and Fidler lost revenue as a result of that. And so the harm to Fidler, much like the recent Target data breach, Your Honor, Target suffered lost business revenue as a result of customers not thinking its payment methods were secure. Fidler stands as a similar actor as Target was in that data breach that happened a couple of Christmases ago. Well, for some period of time. Well, I don't want to beat a dead horse, but what would prevent unlimited monthly subscribers from accessing every record and then using digital cameras to take a picture of every screen? I just have great difficulty seeing what prevents that, and that is essentially what LPS did, albeit automatically and at great speed. Well, Your Honor, there's a disputed question in material fact as to what the term access means. Access under the Laredo system, which LPS admits, by the way, because they admit there were restrictions associated with Laredo, were in fact to search for, view, and print documents. Much like a Netflix subscriber gets to view movies, the Netflix subscriber does not get to keep the movie and save it to their computer because the movie is a thing of value. And so similarly, the documents here are a thing of value. And so access does not mean, and the evidence supports the contention, that access only means that LPS could look at them. And so under the CFAA, they obtained something, which is different than viewing it, Your Honor. FPS paid a fee to see everything, and nothing in the software, it would seem, nothing in the contracts between the counties and Fiddler, and nothing in the end user license agreement that Fiddler required subscribers to agree to prevented LPS from doing what they did. But all they did, essentially, was take an electronic photograph of each record that they had paid to see. They didn't do anything to hide their tracks. Of course, they also did nothing to help Fiddler or the counties track their usage of the system. But I really have a problem seeing fraudulent intent. But I can always be convinced. Well, Your Honor, that's exactly the point. What Your Honor just stated was that they paid to see documents. They did not pay to take documents. And the evidence in the record that LPS admits prevented photographic, the print screen button and screenshots were prevented by Fiddler. The document was displayed in a viewer, it was contained in that viewer, much like when you go to a jewelry store and if you want to buy a watch, it's contained in a glass case. LPS only signed a contract to look. They did not sign a contract to take. And the contracts with the counties that charged specifically stated that they were charged a per-page fee. That is the evidence. And the evidence is also that LPS knew they had to pay if they actually wanted to take a copy. That is the testimony of Linda Taylor. From that testimony, Fiddler can maintain, Fiddler can survive summary judgment because a reasonable jury could conclude that LPS acted with intent to defraud. And access is a disputed question of material fact. Access does not mean to take. They couldn't write down by hand what they saw. They had to memorize everything. Is that what you're saying? They were perfectly entitled to write down what they saw, but that would not serve LPS's business model because they needed millions of documents very quickly, which they shipped overseas. Well, what's the difference between writing it down with a quill pen and taking a picture? The fact that they knew that they would be charged, Your Honor, in terms of taking a picture, taking a picture was not possible with the Laredo software. Print screen was disabled. Screenshot was disabled. Those are the security features that Laredo contained. Well, they were able to take electronic photographs. They were not, Your Honor. That is incorrect. Take electronic photographs. They couldn't take electronic photographs of all the records in each county? They could not, Your Honor. I thought that's what they did and then had typists enter the information they needed from those records into their own computer system. That's incorrect. Isn't that what occurred here? That is not what occurred here. It's incorrect? That is incorrect. In image, what they took was an actual file of each document and transported it overseas.  Could I back you up a minute? Of course, Judge. Let's just start with what you think where the district court erred. The district court erred in finding that LPS failed to act with intent to defraud. An intent to defraud is a scheme to deceive or cheat in order to obtain a thing of value. LPS was deceptive here because they hid their activity. They essentially turned off the security cameras of the Fiddler servers in order to invade Fiddler's computers and take massive amounts of files and take possession of them for which they knew they had to pay, Your Honor. Now, did the district court err as far as you're concerned because she, I guess you call it streaming and downloading distinction? Yes, Your Honor. They were streaming. That was okay. Streaming is fine. Whereas the downloading was clearly, well, I think the district court said something about paper copies as opposed to digital copies. Correct. And by limiting it to paper copies, it overlooked digital copying which is what they were originally paying for with some counties. And when they worked out this bypass, they were no longer paying. And it's because they knew that transition that they were previously paying for and no longer paying for with the bypass means they knew what they were doing as opposed to some accident. Correct, Your Honor. This was not an accident. This was intentional. And what is the material issue of fact that couldn't be eliminated in summary judgment and needs to be tried? Well, one of them, Your Honor, is the issue between copy and print. Some of the county contracts say print. Some of the county contracts submitted into evidence say copy. So what is the definition of taking a copy or taking a print? Essentially, the Laredo system functioned with restrictions, and those restrictions were the only way to actually obtain a copy of the document was to click a print button in the viewer. LPS removed those security features because if they clicked the print button, they would have been charged. So there's no difference between copy and print? There is no difference between copy and print, Your Honor. So the material question is the judge – Is there a difference? I'm not very good at this. Just let me tell you that. I read all this text. But from my limited experience, which is very good, it seems to me that that may be where the district court confined it to, a print copy. Correct. And did not look at what the digital copy, which is the one you can do instantaneously, and also in great volume, and they were paying for it with some counties before that. Yes, they were, Your Honor. And apparently your company shares some of that revenue. The subscription revenue, yes, Your Honor. So that's where your damage is or your loss. Yes, that's correct, Your Honor. So what you're saying is that there were some issues of material fact that shouldn't have been taken out in summary judgment. Yes, Your Honor, especially on intent to defraud and whether LPS in fact caused damage under the CFA Act. So the intent is based on the fact that they knew that before they were paying for digital copies and afterwards they were not. Correct, Your Honor. But they were still doing a lot of viewing or screening or whatever you call it, streaming. Actually, they were not. Once they started using their web harvesters, Your Honor, they were no longer even registering minutes on the Laredo system. They weren't. Were they showing any use of it? It was showing absolutely zero use. And then through that activity, they were essentially concealing themselves. They essentially turned off the security camera. So they're getting... They ended up getting millions of documents for free without anybody knowing. Without even... Oh, I see. So they're basically outside the agreement now. They're very much outside the agreement, Your Honor. And further, Your Honor, and to go back to Judge Rovner's question, LPS signed an agreement or executed an agreement because it was a click-through agreement called the End User License Agreement to use Laredo. It agreed not to copy any portion of Laredo. LPS, in order to develop its web harvester, specifically violated that contract by copying portions of Laredo, taking certain commands that were contained within Laredo, placed it into its web harvesting software that would allow it to get documents but not be tracked. Their 30B6 witness, John McCabe, said, we performed the same transaction just without the restrictions. And so, therefore, the CFAA, as was held in the First Circuit and EF Cultural, and by the Sixth Circuit, determines authorization for access by actions taken by the owner of the computer to prevent such access. Fiddler, both technologically and by contract, specifically took measures to prevent this type of conduct by LPS. Because... How could LPS know how Fiddler's software tracked usage? They seem to have reverse-engineered the SOAP calls necessary to pull up the documents they wanted. But are you contending that they were then required to duplicate the logging process as well? What required them to do so? The law of the CFAA, Your Honor. They were not ever given authorization to enter Fiddler's computers by any other means than Laredo. Each contract that they signed sought to use Laredo. They signed these contracts in order to obtain a password to then put into their web harvester. Now, prior to their use of a web harvester, they knew all of their minutes were tracked and they also knew which documents they were charged for, which documents they took, Your Honor. So LPS, by its prior conduct before using a web harvester, was on notice through the billing generated by Laredo, the invoices that were submitted into evidence. And therefore, LPS was on notice what the restrictions were and how Laredo worked. They chose, they made a decision, for whatever business reason, to circumvent the security features. Circumvention of security features is the classic CFAA fact pattern, Your Honor. They obtained information... But see, here again, I'm really trying to grab hold of this. Sure. Because it seemed to me that FPS paid a fee to see everything and that nothing in the software, nothing in the contracts between the counties and Fidler and nothing in the end-user license agreement that Fidler required subscribers to agree to prevented LPS from doing what they did. I could not find it. Well, Your Honor, the end-user license agreement is the evidence of that. LPS agreed that it copied portions of Laredo and used portions of Laredo to... Yes, but you yourself said that they could write it down by hand. That's called copying, isn't it? But, Your Honor, actually taking possession of a document is different than writing it down by hand. How? Well, I assume that isn't... How? They did not write down by hand, Judge. Your problem is... No, but what I'm trying to get at is what would be the difference if somebody sat down with a pen, wrote everything down or did what they did? Can you help me with that? Of course, Your Honor. They can resell the documents. They cannot resell what they wrote down by hand. LPS has a line... Fine. They can write it down by hand. Then they can type it out. They can do a lot of different things. Well, I'm not sure a title insurance company would grant clean title on handwritten notes on a piece of property, Your Honor. What's the difference in the time... Well, we don't know that, do we? ...to write it down versus to transfer it digitally? Transfer it digitally, Your Honor, can happen instantaneously. The difference in time is massive. Mr. Williams... Yes, Your Honor. ...if we could just focus a second again on intent. LPS, with its web harvester, used it in counties that didn't even charge, right? Yes, Your Honor. So does that in any way impact the question of intent? Not at all, Your Honor, because LPS knew it had to pay to take a copy in other counties. That's the testimony. Well, they certainly weren't trying to conceal what they were doing, right? They absolutely concealed what they were doing, Your Honor. When they show no minutes... Well, they continue to pay for the unlimited subscriptions, right? Correct. And the reason for that, Your Honor, is that if they didn't pay the subscription fee, their password would have been turned off and their web harvester would no longer work. Well, so, but, granted, but how does that speak to concealment, then, if they're participating in a paid subscription program? Your Honor, the testimony and the evidence is that they were using the system. They knew that their documents, that their activities were tracked, and what documents they took were charged. The concealment here is every time they took a document that did not register on Laredo, they concealed that activity from both Fidler and the counties in order to not be billed for taking those documents in the counties that charged. I'm into my rebuttal time, Judge. In fact, you've used your rebuttal time, but we'll grant you a couple minutes, Mr. Williams. Thank you, Your Honor. All right. Mr. Macefield. I have pleased the court. This is not a hacking case. The CFAA and the ICCPL are criminal statutes, and they're designed to combat hacking. As this court has said, malicious activity. Things like inserting viruses, inserting worms, altering data, destroying data, accessing data you're not entitled to access, interrupting service. LPS did none of those things. And we have that from Fidler. If you look at page 11 or 12 of our brief, we went through a litany of items from the various cases, from the statutes, of the things that courts have held to be violations of the CFAA. And Fidler's 30B6 witness, the director of their software development, said, no, no, no, no, no, we didn't. There is absolutely no evidence that LPS accessed any information that it didn't pay to access. It paid a substantial monthly fee to each of the 82 counties for access to the available documents in their database. There's no evidence that LPS went behind a firewall, went into other parts of the computer system, and got access to data. It actually looked at and could only get only the things it paid for, the county's land records. Well, with the counties that were charging for, I guess, paying for copies, I guess, that does some revenue that was eliminated, wasn't it, with the change? I'm glad you brought that up, Judge. I think counsel misspoke or maybe misunderstood your question, because Fidler did not participate in print fees. Fidler participated in the monthly access fee, and it got those fees. I understand that's, just for my own definition, that's the streaming part, right? You could view this. Yes, and Fidler got paid for that. It got its share. It wasn't under any of its contracts with any of the counties going to share in print fees. To the extent there's harm of that nature, which we disagree, that's the county's harm, not Fidler's. And that's a matter of breach of contract, because access, LPS's access was decided by the county's agreements with LPS. So did LPS's conduct violate the terms of Fidler's end user license agreement? Could Fidler have sued for breach of contract? Fidler could have sued for breach of contract. The nature of its claim, really, is that LPS somehow copied its software. Soap calls are not software, by the way. Soap calls are communications, and that's in our brief. But if Fidler wanted to make a claim that LPS was somehow creating a program that copied theirs in violation of the end user agreement, the claim was for breach of contract or some sort of intellectual property claim. They didn't bring that claim. That claim says nothing about access to county information. LPS paid for access to county information. And the documents that are operative about that are not the end user agreement. It's each of the 82 agreements with 82 counties, and they're all different. Did any of the counties allow screen prints or any other digital capture of the records for a fee? Did they? Well, actually, the agreements are silent as to there's no agreement that requires. Fidler kept saying a minute ago that LPS was required to use the Laredo system. It's silent about that. Each of those agreements is silent. Fidler never brought that to the attention of the court. There was no requirement that LPS use the Laredo client. Fidler entirely left access up to the counties. We've got the citations to their people who said we didn't look at any agreements. We didn't give them any language to put in agreements. We just let them do what they wanted. As a result, these counties or county recorders, they're good at their job, but they're not sophisticated about technology. They didn't include anything about how LPS had a go about accessing or that LPS had to use Laredo client. Almost all of them. I'm sorry. Have any of the counties sued LPS for lost fees? They have. A handful have. There's a couple of cases pending in Indiana, and there's a case pending in Michigan. And in those cases, the fight's going to be over whether a copy or rather a print, because really almost all the contracts talk about print fees, not copy fees. And LPS didn't print anything. LPS downloaded. I have a problem with that. You're saying there is definitely a difference between printing and copying. Sure, Your Honor. Printing is printing. It's using a printer. It's printing it on paper. These are contracts of adhesion. Keep in mind, these counties, and that's in our papers as well, when the counties, there's no negotiation. The county says here, here are our terms and condition. If you want to get access to our documents, you sign this. So the counties, to the extent there's an ambiguity as to whether a print is a copy, it's got to be construed against the counties. Part of the problem for the district court was that Fidler never ever said, here, Judge, here's language from County A. Here's what it says. Here's why you should equate printing, copying, and downloading altogether. Fidler never directed the court to that language, and that was its burden. If access is determined by the county agreements, then the only way to determine whether LPS somehow went beyond that access is to parse that language, to look at that language. It's up to the trial court, the district court, to interpret that language in the first instance. Well, I admit this confuses me enough, but it seems like what we're talking about, she also talked about the system and going into that and stop there, because I know there are other parts that talked about system and then data, program, or information. A lot of words that have different meanings, I guess. They do, and the word system really came up in a lawsuit late in the game. Fidler, the way the CFAA defines it, it's harm to a computer, and then it defines damage to a computer as including damage to a system, so a system on a computer. So it's damage to a computer, and then damage to a computer is defined as including damage to a system. Fidler wants to say the way the CFAA uses system is it's looking at a system of two computers, but that's not how the language is used. What the district court was pointing out is you actually have two totally separate software programs. When Mr. Noe, who was Fidler's director of programming, testified first early in the case before they had this idea, his testimony was, well, when I refer to Laredo, I just think of the client. That's the thing that somebody downloads onto their computer that can talk to what's called the middle tier. In their brief, in their opening brief, Fidler says, the only way to talk to the middle tier is through the Laredo client. That's just not right. Mr. Noe testified that there are at least four different programs that Fidler has that talks to the middle tier, two of which can be used by what I would call retail-type customers, people like LPS, to talk to the middle tier. The license agreements with the county between Fidler and the counties allowed the counties to allow third-party software to access the middle tier. So Fidler's discussion of system, there's really no basis in the statute to equate this using the public internet, having a program over here on somebody's personal computer that is actually within a company network, talking to a server at a remote distance to consider that one closed system that is somehow deserving protection of the CFAA. Again, nothing in any one of these county contracts required that LPS use the Laredo client. They just didn't require. LPS was fully within its rights. If the counties want to restrict that, and counsel mentioned the EF cultural travels case, in that case, the fix for stopping web harvesting is very easy. And Fidler knew this from the year before it sued LPS. The fix is, you just say in your agreement, no web harvesting. Why did, I guess it was something like 44 counties cancelled based on what, this litigation or based on some challenges? Well, they stopped serving LPS. They didn't cancel Fidler. They continued to serve, they continued to use Fidler. One county in Indiana didn't renew its agreement with Fidler. And the reason she did, she actually gave three reasons. The first one was the other vendor, when it came contract renewal time, was cheaper. Okay, that's a good reason. The other vendor, she knew the guy. She liked him. And then the third reason was, after all this came out, she didn't feel comfortable with Fidler. Well, I thought there were more than that. No, no. Only one county did not renew. And she didn't cancel. She just didn't renew. These are typically two- or three-year terms. I can understand that. There wasn't some massive abandonment or change. No, there was not. No, there was not. And keep in mind that these are public documents. And this is an issue that's floating around in here. These county recorders have an absolute obligation under each of their state laws to make public documents available to the public. In other words, you can go in at any county recorder's office and park yourself in front of their terminal and look at these documents. And if you want a copy, you pay several dollars. Well, that's so that the county can recover its cost. And that's set by statute. When you're using your own computer and you're just downloading to your own computer, that doesn't cost the county any money. It's not out any paper. It's not out any toner. It's not out any help from a staff so that you can print that. And that's the fight that's going on in other cases with the counties. So I take it you would agree that the only damage was to Fidler's reputation with its clients, with the counties, because the counties realized that the Laredo system contained some gaping holes. Would you agree with that? Well, it's a little more complicated. I think that Fidler didn't do a good job of advising its counties. And it didn't really lose reputation. It lost one customer because they didn't renew. Part of the problem here, and the reason Fidler filed the lawsuit, and there's documentation, I'm not just coming up with this and throwing bombs here, it's in the text, is that Fidler saw a customer relations problem. It knew for a year before it ever sued LPS some things. It knew that LPS was a large bulk data user. It knew that LPS was in an expansion project, in other words, going from about 800 counties to 2,600 counties. There's 3,100 counties in the country. Say that again. How many? There's 3,100 counties in the country. LPS was going from 800- There are 92 in Indiana. There are. I've been in almost every courthouse. And they knew that bulk data users like LPS used web harvesters, because CoreLogic, a competitor of LPS, was using a web harvester. And then in about March 2012, a company called First American Title, they also found that was using a web harvester. Then, a couple of months even before that, they had gotten a misdirected email from somebody at LPS through a county recorder that said it was from somebody at LPS with the title web harvester. And the county recorder forwarded that to Fidler, saying, what does this mean? Should I be scared about it? Fidler's reaction was, yeah, you should. Fidler didn't investigate. What Fidler did was say, you should buy our new product on Monarch. Also during 2012, Fidler gets at least 12 inquiries from different county recorders about LPS not showing minutes. And they don't care. What they do is they get on a plane and go out to LPS and say, we know you want data in bulk. We're willing to sell it to you. Fidler never asked, why are you showing no minutes? And the fact is LPS didn't know, didn't have any idea about how Fidler tracked usage. And in fact, LPS usage was tracked on the servers. For whatever reason, Fidler tracked for billing purposes on the client. That's the thing on the user's computer. But they had LPS's usage on the server side. LPS didn't use a dummy password, didn't use a dummy username, didn't go out through some eastern block internet address and come back in the back door. So what happened was when Fidler decided to sue LPS, it took two of their people just a couple of days to look at the server logs and see all of LPS's activity. So in other words, what you are saying is this, bottom line. Fidler shot itself in the foot by leaving open the contractual and technological means for FPS to help itself to images of the data. Is that what you're saying? Well, wouldn't that be they shot itself in their foot that they don't have a hacking claim, really. I mean, if they wanted to sue under their end user agreement, they should have sued under their end user agreement. They just don't have a computer hacking claim. Because they weren't the party harmed. LPS didn't have fraudulent intent. LPS didn't get anything that it wasn't authorized to get. It didn't look at other documents that it got. Fidler really just doesn't have a hacking claim. So can it still? No, it would have been compulsory with this case, Judge. They can't go back and refile. Excuse me? I want to say something a little bit about intent because it's important. Counsel mentioned a number of different times Linda Taylor. There's a few things the court needs to understand about Linda Taylor. Fidler really relies heavily on her in regard to intent. What Fidler wants her testimony to have been, which it's not, is that LPS knew that to get a digital copy, you had to pay for it through Laredo. That wasn't her testimony. Whose was it? It was nobody's. Because in their opening brief, what they said was, let me find it here. In their opening brief, they quoted part of her testimony. They said LPS knew, quote, it had to pay extra if it wanted to actually get a copy of an image. But that was not her complete testimony. So we came back on our response. And what we said was, here's the next question and answer. The next question was, now, this is the question, did you know whether Laredo allowed LPS to take control of the digital image? Answer, I had no knowledge of that. Then on reply, Fidler, like now, is going to get the last word. They said, wait a second, LPS, there's more of her testimony. And so they added an extra question and answer, except they gave, they didn't quote the testimony correctly, and they didn't give her a complete answer. That has a serious implication of potentially misleading this court. What they said, and again, the precursor question, which LPS quoted in its response was, the question now, do you know whether Laredo allowed LPS to take control of the digital image? The answer was, I had no knowledge of that. Fidler, in his reply, comes back and says, adds the question, meaning you didn't think it did? And then Fidler quotes or purports to quote her answer. And they say, meaning it didn't, period. Well, it's not a period. It's a dash. And there are eight or nine more lines of testimony after that. Punctuation matters. It wasn't a declarative statement that she thought that she couldn't download a digital image. Because here's what she said. Here's the complete answer. Meaning it didn't dash. All I knew was what was in this agreement. And all I contemplated was going on, dash, using clerks to go on to the Laredo system and to sit there and pay for the time to get the information we needed to look at the website. That's all I dashed. That's as far as I got into understanding, period. There might have been more available from Laredo. I don't know. Now, Fidler didn't cite this testimony to the district court. And it didn't actually include the full answer with the district court. The second page, when I flipped the page, that's not in the record. Fidler had the obligation, if it was going to rely on that testimony, one, to cite it accurately, not to change the dash into a period. And two, to include the complete answer. We find ourselves in a little bit of an odd place because the circuit rules ordinarily would require we go back to the district court to supplement the record. We just realized this within the last few days. This court obviously has the inherent authority to supplement the record, take judicial notice. We'd be happy to file that page on motion if that's what the court would like. The court, I suppose, could also disregard Fidler's misquotation of the testimony. But it's not right. And it doesn't establish that LPS knew that it owed them a fee for copying. We'll give Mr. Williams an opportunity to respond to that. And then we'll make a determination whether or not his time is not done, Mr. Williams. And then we'll make a determination of whether we want any further submissions. Well, I see my time is up. You can make a concluding remark. I would just say the district court didn't reach all of our issues. We moved for summary judgment on many, many, on every level of each of these claims. The district court didn't feel a need to reach each and every one of those. We ask that the court affirm the district court, if not for the reasons set forth in our opinion, but for the other reasons stated in our papers. Thank you. Thank you, Mr. Williams. You may have two minutes. No, that's all right. It's difficult to see from where you are where the light is. Your Honor, as to Ms. Taylor's testimony first, 30B6 witness John McCabe. Here is the direct testimony. Are you able to download a document through the user interface without incurring a print fee? Yes. How do you do without incurring a print fee? Yes. By using the Laredo interface that shows up on your computer? I'm sorry. It would require a third-party software package to actually capture the image on the screen. That is, their 30B6 witness and Linda Taylor agree that downloading was not possible on Laredo. And so, therefore, Linda Taylor's testimony in context is very simple. It knew with Laredo she had to pay to actually get a copy. Linda Taylor didn't think downloading was available. Judge, how do you... If Fiddler Controls, which LPS admits that the restrictions controlled LPS's ability to download, and if you can't download, and the only way you can get a copy is to print, that is the evidence that is sufficient for a reasonable jury to conclude that LPS acted with intent to defraud because it knew it was getting something it couldn't get and it knew it had to pay for it otherwise. So, downloading was not possible. Now, Mr. Mixdorf brings up an interesting point and it's frankly a little confusing. As Judge Rovner was asking earlier, they had access to documents. Access is kind of a magic term here. The CFAA talks about access to a computer. And so, therefore, Fiddler set limitations and restrictions on its access to its computers, the object of which was to get documents. But access to documents is not defined by the county. It is defined straightforwardly in the Fiddler and User License Agreement and in the software itself that contained restrictions that LPS knew of. Could the radio system have been encrypted to prevent what occurred here? Well, Judge, Creative Computing v. Get Loaded out of the Ninth Circuit that we cited in our paper said specifically the defendant's arguments that a preventive patch could have used a preventive patch is analogous to a thief arguing that I would not have been able to steal your TV if you had installed deadbolts instead of that silly deadlock. Courts around the country, including the Northern District in Tamboro, United States v. Morris in the Second Circuit, and Associated Press v. Meltweather in the Southern District of New York, have all rejected LPS's defense. Just because LPS figured out a way in, that would put an incredible burden on the CFAA. It would essentially be reading in to the CFAA that someone has to prevent all damage that a hacker will attempt. It puts the burden on a computer owner to figure out what its holes are. Fiddler figured out what the hole is after it engaged in a three-month-long investigation, not a couple of days, as Mr. Mixdorf represented to this court, and then figured out what happened and actually encrypted the SOAP calls, and LPS no longer wants to use encrypted SOAP calls because they can't get documents for free anymore, Judge. For these reasons and the reasons stated in our briefs, we ask the court reverse the district court's grants of summary judgment and remain in the case for trial. Thank you, Mr. Williams. Thanks to all counsel. The case is taken under advisement.